**In re John A. MURRAY and Adrianne R. Murray, Debtors.**

**Bankruptcy No. 94–10343–PHX–SSC.**

United States Bankruptcy Court,
D. Arizona.

Jan. 3, 1996.

---

Russell A. Brown, Chandler, AZ, for Debtors.

David Kerrigan, Director, Nationwide Homeowner Assistance, Mesa, AZ, pro se.

Albert M. Rau, Chapter 13 Trustee, Phoenix, AZ.

Adrianne Kalyna, United States Trustee, Phoenix, Arizona.

## MEMORANDUM DECISION AND CERTIFICATION TO THE DISTRICT COURT

SARAH SHARER CURLEY, Bankruptcy Judge.

On November 25, 1994, JOHN and ADRIANNE MURRAY, the Debtors, filed a motion for an expedited hearing and request for the turnover of the funds paid by them to a document preparation service. The Court issued an order to show cause to determine whether the document preparer had violated the newly enacted provisions of Section 308 of the Bankruptcy Reform Act of 1994, 11 U.S.C. § 110. The document preparation service filed a responsive pleading. The Debtors then retained counsel, and a hearing was conducted on this matter.

This constitutes this Court's findings of fact and conclusions of law pursuant to Rule 7052, *Rules of Bankruptcy Procedure* ("RBP"). This is a "core" proceeding and this Court has jurisdiction over this matter. 28 U.S.C. §§ 1334 and 157.

### Factual Discussion

On November 21, 1994, the Debtors filed their voluntary petition pursuant to Chapter 13 of the Bankruptcy Code. Nationwide Homeowner Assistance ("Nationwide"), which is a sole proprietorship of Dave Kerrigan ("Kerrigan"), assisted the Debtors with the filing of the bankruptcy petition.[1] The Debtors had only recently encountered financial problems.

Mr. Murray was in the military for fourteen years. However, when he decided to leave the military, he found the transition to civilian life difficult. He was unemployed for approximately one year and held a position with a financial institution for approximately three months. The Murrays also encountered financial problems because they were no longer entitled to base housing and other financial benefits that were provided to military personnel. However, he was subsequently employed with the State of Arizona Department of Youth Treatment and Rehabilitation, and had held that job for approximately one year at the time of the hearing before this Court.

The Murrays had obtained the necessary financing, with the assistance of the Veteran's Administration (hereinafter "VA"), to acquire a home located at 7207 W. Tuckey Lane, Glendale, Arizona. The Debtors had employment and transitional problems which caused them to default on the underlying mortgage transaction, and the VA repurchased the loan from the financial institution. The VA commenced foreclosure proceedings, and scheduled a sale of the Debtors' home for November 23, 1994.

Shortly after the notice of the foreclosure sale of the Debtors' home appeared in a Arizona newspaper of general circulation, the Debtors received a brochure from Nationwide.[2] The Debtors were unsure how they received such a brochure; however, Kerrigan conceded at the hearing that he received a mailing list from the Maricopa County Recorder's Office concerning notices of trustee's sales and that he sent all of the people on the list one of his brochures or a letter outlining Nationwide's services.

The Debtors' brochure proclaimed:

### NO HASSLES

### NO GIMMICKS

### NO RUNAROUND

Just smart, clear financial advice for homeowners who are having trouble making their mortgage payments.

---

**1.** Kerrigan testified that not only was Nationwide a sole proprietorship, but that Kerrigan was the only employee of the business.

**2.** *See,* Debtors' Exhibit 1. All references to an exhibit in this footnote and hereinafter are to exhibits admitted in evidence at the Court's order to show cause hearing.

Call today for your FREE consultation.

## STOP FORECLOSURE IMMEDIATELY & TAKE ADVANTAGE OF THESE PROGRAMS:

\* \* \* \* \* \*

We have a 98% Success Rate—call today![3]

The brochure states that three million homeowners are in default in their mortgage payments in a given day. Nationwide then states that there are little known federal government programs in effect to help homeowners and that Nationwide has developed the expertise or knowledge to have homeowners accepted into the various programs which will prevent foreclosure of their homes. The brochure touts Nationwide as being rated "number 1" in Arizona "with more successes than any non-Federally assisted company."[4] The brochure states that Nationwide is a "support organization based on Christian values,"[5] and that the federal government and the financial institutions are not providing information of relief or financial programs to the homeowners who are in default in "plain simple language."[6]

3. *Id.*, p. 1. Kerrigan conceded at trial that his success rate was only 80 to 90 percent and that he only achieved that rate if the debtor was accepted into one of the federal programs. Whether a debtor was accepted into the program depended, for instance, upon the debtor's monthly net income and expenses, the loan to value ratio on the residence, and the debtor's having *not* filed a bankruptcy petition.

4. *Id.*, p. 2.

5. *Id.*

6. *Id.* at pp. 2–3. Using a format of questions and answers, Nationwide traps the unwary or unsophisticated. A representative sample of the questions and answers is as follows:

> Homeowner: If these programs are so great, why wasn't I told about them?
> Nationwide: The government has put the responsibility on your lender to notify you of the programs available. You may have been notified and not even know it. With terms like "assignment" and "continued occupancy program," most people just don't understand the paperwork that they have received.
> Homeowner: I don't remember receiving any paperwork explaining these government programs, why?

Since the Murrays were concerned about the foreclosure of their home, they scheduled an appointment with Kerrigan.

On September 21, when the Debtors first met with Kerrigan, they noted that Kerrigan came across as competent and professional. However, he did *not* encourage the Debtors to be accepted in one of the federal government programs. Instead he discussed the Debtors' financial statement, and he described the benefits of the Debtors' filing a bankruptcy petition. He persuaded them that commencing a bankruptcy proceeding was the recommended course of action for the Debtors to take.[7] This first meeting was approximately two months prior to the scheduled foreclosure sale of the Debtors' home and at a time when the Debtors had missed only one payment on the lease for the car that the Debtors needed for work.

 Kerrigan assured the Debtors that their home and car would be protected. He then described the benefits of a Chapter 13 to the Debtors. He assured the Debtors that there would be just one payment a month— to the Chapter 13 trustee, and that they

> Nationwide: We're not surprised, our mortgage review board has discovered that over 75% of mortgage lenders fail to properly notify homeowners or explain the programs available in plain simple language.
>
> \* \* \* \* \* \*
>
> Homeowner: What makes you so good at this and how can you help me?
> Nationwide: Experience. We know your rights. Many of our staff members have been through the trauma of foreclosure proceedings and have learned firsthand what foreclosure is like and what help there is available to you. We know everything it takes to help you and get you accepted into these programs. We know how to stop foreclosure and how you could save your home.
>
> *Id.* at 3.

7. At the hearing, Kerrigan testified that he discussed the VA and possibly other programs with the Murrays. However, on cross examination, Kerrigan could not recall what programs were discussed with the Murrays and why the Murrays decided to file a Chapter 13 petition. He could not recall the loan to value ratio as to the Debtors' residence and whether the Debtors' net income exceeded their monthly expenses, which he testified were critical factors in proceeding with a VA program.

could reduce their home and car payments.[8] He stated that he would prepare all of the Chapter 13 papers and that the Debtors would receive a letter from the Court simply telling them how much they needed to pay a month.[9]

The Debtors agreed to have Kerrigan file the Chapter 13 petition, schedules, Chapter 13 plan, and other documents for them, and they would pay him $300 for Kerrigan's services. The Debtors also had to pay the filing fee of $160. The Debtors provided Nationwide with a check in the amount of $300, with the Debtors to pay Kerrigan the balance when they were able.[10]

Initially the Debtors and Kerrigan had focused on filing the bankruptcy petition in October, 1994. Believing that no payments had to be immediately made, the Debtors then asked if the bankruptcy petition could be filed November 1, 1994, well in advance of the foreclosure sale. It was agreed that Kerrigan would file the petition November 1, 1994. Kerrigan provided the Debtors with a packet of information and documents to complete. The Debtors returned the documents to Kerrigan in October. Kerrigan delayed preparation of the bankruptcy petition. The Debtors did not execute any documents concerning their bankruptcy case until November 14. Mr. Murray recalled

executing "seven or eight" documents on that day in Kerrigan's office. Kerrigan assured the Debtors that "everything would be taken care of." Kerrigan told Mr. Murray that he need only wait for the letter from the Court—that the matter was "a done deal." Kerrigan assured Mr. Murray that the notification of the filing of the bankruptcy petition would be sent to the leasing company concerning the Debtors' car.

Unfortunately, on November 18, the Debtors' car was repossessed. On November 20, Kerrigan only responded to Mr. Murray's urgent inquiry by stating that he was going to fax "important information" to the Debtors. Incredibly, Kerrigan simply faxed the documents that he had previously given to the Debtors. The Debtors would have to complete again the documents previously given to Kerrigan.

On November 21, Mr. Murray visited Kerrigan's office. By this time, because of the repossession of the Debtors' car, Mr. Murray was forced to rent a car. Kerrigan could not find the file during Mr. Murray's visit. Kerrigan also referred to the payment of the filing fees for the Debtors, so Kerrigan had not yet filed the bankruptcy petition. He offered to pay $30 for the Debtors as an installment for their filing fee.[11] Kerrigan

---

**8.** Kerrigan had convinced the Debtors to file a Chapter 13 petition based upon legal advice which was wrong and which Kerrigan did not have the knowledge, skill, experience or expertise to provide. At the time of the conference, the United States Supreme Court had already rendered its decision of *In re Nobelman*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), which prohibited a "strip down", or bifurcation of a claim into a secured and unsecured portion as to a creditor that only had a lien on the Debtors' home. The Debtors could have paid the arrearages through a Chapter 13 plan, but they would have been required to make separate payments in the current amount of their mortgage payment as well.

The car posed additional problems, since the Debtors had entered into a lease transaction. The Debtors would have to assume the lease, as a part of their plan or by motion, prior to or at the time of confirmation. Normally when a lease is assumed pursuant to 11 U.S.C. § 365, the debtor cures any default under the lease and provides adequate assurance of future performance pursuant to the terms and conditions of the lease. As to a secured transaction concerning a car, the debtor only needs to pay the wholesale value of

the vehicle through the plan. *In re Mitchell*, 954 F.2d 557 (9th Cir.1992); *In re Malody*, 102 B.R. 745 (9th Cir. BAP1989). It is unclear whether the Debtors had a true lease or a disguised secured transaction. However, in reality, the Debtors' payments would be substantially greater than what Kerrigan promised.

**9.** The Court does not send a letter stating how much a debtor should pay. The debtor ultimately proposes the payment to creditors in a plan of reorganization, which may be confirmed by the Court. The Court then separately executes an order of confirmation.

**10.** *See*, Debtors' Exhibit 2.

**11.** On November 4, the Debtors paid an additional $100 to Kerrigan, for the total amount of $400. *See*, Debtors' Exhibit 2. Therefore, with Kerrigan's offer to pay $30 of the filing fee, the Debtors have accounted for $430 of the total amount of $460 to be paid to Kerrigan ($300) and for Court filing fees ($160). Kerrigan may have filed a document requesting that the filing fees be paid in installments and the Debtors paid the balance owing in cash.

did not focus on how to assist the Debtors in their predicament of having to rent a car at substantially higher rates than their lease payments.

The November 21 meeting was also critical to Mr. Murray since it was two days prior to the November 23 foreclosure sale of the Debtors' home. Kerrigan assured Mr. Murray that even if the bankruptcy petition were filed later than the November 1 date, as originally promised by Kerrigan, it was not a problem.

The Debtors filed their bankruptcy petition on November 21, 1994. None of the required documents, such as the schedules, statement of affairs, and the Chapter 13 Plan, were filed. The Debtors learned in a conversation over the telephone with an attorney that Kerrigan was not assisting them properly as to the car. The Debtors then took action on November 25 to request a turnover of the car repossessed prepetition. Although the Debtors had previously completed the Schedules and other necessary Chapter 13 documents, Kerrigan could not locate all of them and only filed Schedules I and J on the Debtors' behalf. *Therefore, the Debtors had to retain counsel; their counsel had to prepare a motion for extension of time to prepare and file the Chapter 13 documents; the Debtors had to complete the documents again; and the Debtors' counsel had to file the documents subsequently with the Court.*

The Debtors' petition and the initial documents prepared by Kerrigan did not state that the Debtors were assisted by a document preparer. No identifying number of anyone that had assisted the Debtors in the preparation of the petition was listed anywhere on the initial document. As noted previously, Kerrigan did collect at least $30 of the filing fee from the Debtors.[12] Kerrigan never filed a declaration disclosing the fee that he received for his services.[13]

This Court rejects the testimony of Kerrigan in which he stated the Debtors did not provide the documents in a timely manner or that the Debtors only partially completed the documents. Kerrigan misplaced the information and documents completed by the Debtors. This Court also rejects the testimony of Kerrigan that the Debtors were not specific about the deadlines that they were facing and, based upon same, when the bankruptcy petition had to be filed.

Because of Kerrigan's failure to prepare documents in a timely manner, the Debtors' car was repossessed before the Debtors could file their bankruptcy petition. The Debtors were forced to rent a vehicle for an initial rate of $40-a-day. They subsequently obtained a lower rate of $20-a-day. The Debtors were forced to rent a vehicle for at least a month which cost them approximately $631.73.[14]

Finally, to focus on the egregious nature of Kerrigan's actions, *after* the Bankruptcy Code was amended on October 22, 1994 concerning the responsibility and possible liability of document preparers, Kerrigan forwarded a "progress report" to members of his "little group."[15] It is unclear how many individuals are in the group, but the progress report is critical of the in-house debt counseling services of the Department of Veterans Affairs for those debtors with VA loans, talks about HUD-approved mortgage relief coun-

---

**12.** Kerrigan eventually received $400 from the Debtors. *See* note 11, *supra.*

**13.** Kerrigan testified that he properly completed the petition as a document preparer as to John Moyer, John Stepanelli, Harold Burnine, Kevin Thomas, Thomas Baker, and Margaret Gonzales. The Court has reviewed the indices for the District of Arizona and notes that "Stepanelli" and "Burnine" did not file bankruptcy petitions in Arizona. As to the other individuals, they filed at least two separate petitions *per person.* Moreover, each debtor's signature on the first petition varies from the debtor's signature on the second petition, further undermining Kerrigan's credibility and posing additional problems as to exact-

ly what actions Kerrigan was taking on behalf of various debtors.

**14.** *See,* Debtors' Exhibit 3. The Debtors did not document the entire rental car expense at the time of the hearing, since the expense was ongoing. One part of Exhibit 3 was a contract with Saban's and reflected $341.73 had been paid by the Debtors. The other document was with a second unnamed rental car company, and the company had not yet calculated the amount payable by the Debtors.

**15.** *See,* Court Exhibit I.

seling services and criticizes said services for not providing information about relief under the Bankruptcy Code, and touts the new American Home Savers Program which "takes the best of what has been offered in the past and transforms this knowledge into a home base of information and counseling services that is the very best in the market-place today." [16]

Interestingly enough, Kerrigan notes that bankruptcy is "a viable and profitable option." [17] Kerrigan then notes in his report that his organization is assisting state and federal authorities to clean up the market-place—one assumes the market place providing counseling services. [18] Kerrigan then promises to provide members with updated guidelines ("Guidelines") of the HUD's Pre-foreclosure Sale Program concerning those debtors that do not qualify for the mortgage relief or debt restructuring program and decide to sell their property prior to fore-closure. The Guidelines will apparently assist those members of the group that are real estate agents or brokers and want to sell the property of various debtors. [19]

Kerrigan testified, and the report so reflects, that Kerrigan intended to apply for his Arizona real estate agent's license to assist further in providing better service to members of his group. [20]

Kerrigan testified that the members of his group paid a one-time fee of $750 to join. Kerrigan further testified, which the Court found not credible, that only four members had joined his group.

16. *Id.* at p. 1.

17. *Id.*

18. *Id.* at p. 2.

19. *Id.*

20. *Id.*

21. Generally, the 1994 amendments to the Bankruptcy Code apply to cases filed after October 22, 1994. Section 110 has such an effective date. *Bankruptcy Reform Act of 1994,* Pub.L. No. 103–394, sec. 702(a), § 110, 108 Stat. 4106, 4150 (1994).

22. 11 U.S.C. § 110(b)(1) provides:

*Legal Analysis*

Congress enacted a number of amendments to the Bankruptcy Code in October, 1994. Specifically, Section 110 was added to Title 11 to help regulate and resolve some of the abuses of the document preparers. A "bankruptcy petition preparer" is defined as

a person, other than an attorney or an employee of an attorney, who prepares for compensation a document for filing.

*See,* 11 U.S.C. § 110(a)(1).

The Bankruptcy Code defines "document for filing" as

a petition or any other document prepared for filing by a debtor in a United States bankruptcy court or a United States district court in connection with a case under this title.

*See,* 11 U.S.C. § 110(a)(2). Kerrigan conceded that he prepared the bankruptcy documents for the Debtors and that he had assisted others in such a manner after October 22, 1994. [21] Kerrigan also stated that Nationwide was a sole proprietorship of which he was the only employee. Therefore, to the extent Nationwide has violated any statutory provision, Kerrigan is personally liable therefor.

Reviewing the documents filed in this case, Kerrigan violated 11 U.S.C. § 110(b)(1), [22] because as the document preparer, Kerrigan did not print his name and address on the petition and did not sign the petition in such a capacity.

Kerrigan violated Section 110(c)(1) and (c)(2), [23] insofar as Kerrigan did not list his

A bankruptcy petition preparer who prepares a document for filing shall sign the document and print on the document the preparer's name and address.

23. 11 U.S.C. § 110, Subsections (c)(1) and (c)(2) provide as follows:

(1) A bankruptcy petition preparer who prepares a document for filing shall place on the document, after the preparer's signature, an identifying number that identifies individuals who prepared the document.

(2) For purposes of this section, the identifying number of a bankruptcy petition preparer shall be the Social Security account number of each individual who prepared the document or assisted in its preparation.

social security number after his signature on the document that he prepared.

Kerrigan violated Section 110(d)(1).[24] He delayed several months in preparing the bankruptcy documents and had the Murrays execute all of the documents on November 14. Thereafter, Kerrigan misplaced the documents, only filing the petition and Schedules I and J on November 21, 1994. Kerrigan did not provide the Debtors with a copy of the documents prior to their filing.

Kerrigan violated Section 110(g)(1)[25] by advancing the sum of $30 on behalf of the Debtors for Court filing fees.

Kerrigan also violated Section 110(h)(1)[26] by not filing any declaration, under penalty of perjury, disclosing the $300 fee that he was to receive in this case.

■ Kerrigan's sole defense is that he did not act with malice or intent to subvert the law. In essence, he argues that he should be given a period of time to comply with the law.

Section 110 provides that the various fines will not be imposed under subsections (b)(1), (c)(3), and (d)(2) if the bankruptcy petition preparer's failure was due to reasonable cause. Subsections (g) and (h) have no such defense.

Kerrigan has failed to provide any credible evidence that his numerous failures were due to any cause, let alone reasonable cause. When Congress enacted the 1994 amendments to the Bankruptcy Code, it directed that Section 110 apply to any bankruptcy case filed after October 22, 1994. There was no grace period. Kerrigan's so-called igno-

rance of the law, even if true, would not be reasonable cause to vitiate the imposition of fines. In any event, the Debtors' case was filed November 21, 1994, almost a month after a change in the Bankruptcy Code. That was more than enough time for Kerrigan to become familiar with the 1994 amendments.

More importantly, this Court concludes that Kerrigan's timing of his report (shortly after the 1994 amendments to the Bankruptcy Code) to other members or proposed members of his group, requesting that they join him in the "viable and profitable" bankruptcy area, reflects Kerrigan's intent to exploit the market irrespective of any changes in the law.

The Court shall impose the fine of $500 for each violation of the Code under subsections (b)(2), (c)(3), (d)(2), and (g)(1), for the aggregate amount of $2,000. The Debtors' counsel should prepare a separate order to enforce this part of the Court's Decision.

■ Moreover, for Kerrigan's failure to file the declaration as required to disclose his fee, the Court shall order Kerrigan to return the sum of $300 to the Chapter 13 Trustee, which amount is found to be in excess of the value of the services rendered by Kerrigan.[27] The Court determines that the reasonable value of Kerrigan's services was zero, since Kerrigan lost the Debtors' information and/or documents on several occasions and only filed a master mailing list, a "bare bones" petition, and Schedules I and J on their behalf—after the Debtors' car had been repossessed. The Debtors also had to retain counsel to refile all of the Schedules and the

---

**24.** 11 U.S.C. § 110(d)(1) provides:

A bankruptcy petition preparer shall, not later than the time at which a document for filing is presented for the debtor's signature, furnish to the debtor a copy of the document. This provision was not specifically enumerated in the Court's Order to Show Cause. However, the Court learned of the violation during the course of the Order to Show Cause hearing.

**25.** 11 U.S.C. § 110(g)(1) provides:

A bankruptcy petition preparer shall not collect or receive any payment from the debtor or on behalf of the debtor for the court fees in connection with filing the petition.

**26.** 11 U.S.C. § 110(h)(1) provides:

Within 10 days after the date of the filing of a petition, a bankruptcy petition preparer shall file a declaration under penalty of perjury disclosing any fee received from or on behalf of the debtor within 12 months immediately prior to the filing of the case, and any unpaid fee charged to the debtor.

**27.** 11 U.S.C. § (h)(2) provides:

The court shall disallow and order the immediate turnover to the bankruptcy trustee of any fee referred to in paragraph (1) found to be in excess of the value of services rendered for the documents prepared. An individual debtor may exempt any funds so recovered under section 522(b).

See, note 26, supra, for the provisions of 11 U.S.C. § 110(h)(1).

Chapter 13 plan on the Debtors' behalf. Again, the Debtors' counsel should prepare a separate order for this Court's execution to enforce this part of the Court's Decision.

The Court cannot overlook Kerrigan's use of a brochure to lure individuals in desperate financial need to his offices. Nor can the Court overlook Kerrigan's report to members of his group, enticing unsophisticated individuals to learn about Kerrigan's services in the "lucrative bankruptcy area" for the price of $750.

■ Certainly the brochure, which was misleading and inaccurate, and Kerrigan's use of the brochure to lure individuals to his offices so that he could discuss only a bankruptcy filing with them were unfair or deceptive acts within the meaning of 11 U.S.C. § 110(i)(1).[28]

Therefore, this Court also certifies the foregoing facts as to unfair or deceptive acts to the United States District Court for further proceedings. This Court recommends to the District Court that the Debtors receive:

(1) their actual damages, consisting of the rental of a car;

(2) statutory damages as set forth in Section 110(i)(1)(B); and

(3) any reasonable attorneys' fees and costs incurred by the Debtors' counsel in pursuing the matter in the District Court.

As to the report to members, it is unclear if Kerrigan is offering a franchise to individuals or some other interest in his organization. Depending on the nature of the interest being offered, and in what jurisdiction the various individuals resided at the time of the offer, Kerrigan may have violated federal and state securities laws or other laws. The Court has insufficient information about Ker-

rigan's organization and the use of the letter, and no party has specifically alleged a violation of federal or state law concerning the membership report. However, the Court does conclude that Kerrigan was not credible when he stated that only four individuals, sophisticated in the real estate area, each paid him the one-time fee of $750 to join his group.

The Court will refer Kerrigan's use of the brochure and the report to the United States Trustee for further investigation and action.

---

**28.** 11 U.S.C. § 110(i)(1) provides:

If a bankruptcy case or related proceeding is dismissed because of the failure to file bankruptcy papers, including papers specified in section 521(1) of this title, the negligence or intentional disregard of this title or the Federal Rules of Bankruptcy Procedure by a bankruptcy petition preparer, or if a bankruptcy petition preparer violates this section or commits any fraudulent, unfair, or deceptive act, the bankruptcy court shall certify that fact to the district court, and the district court, on motion

of the debtor, the trustee, or a creditor and after a hearing, shall order the bankruptcy petition preparer to pay to the debtor—

(A) the debtor's actual damages;

(B) the greater of—

(i) $2,000; or

(ii) twice the amount paid by the debtor to the bankruptcy petition preparer for the preparer's services; and

(C) reasonable attorneys' fees and costs in moving for damages under this section.